## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| McGINNIS CONSTRUCTION CO., Inc., individually and on behalf of all others similarly situated, | Case. No. _____ |
| *Plaintiff.* | **CLASS ACTION COMPLAINT** |
| v. | |
| RB GLOBAL, INC.; ROUSE SERVICES LLC; UNITED RENTALS, INC.; SUNBELT RENTALS, INC.; HERC RENTALS INC.; HERC HOLDINGS INC.; H&E EQUIPMENT SERVICES, INC.; SUNSTATE EQUIPMENT CO., LLC, | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

Plaintiff McGinnis Construction Co., Inc. ("Plaintiff" or "McGinnis"), individually and on behalf of all others similarly situated (the "Class" as defined below), upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint to recover treble damages, injunctive relief, and/or other relief as appropriate, based on violations of the Sherman and Clayton Acts by Defendants RB Global, Inc., its wholly owned subsidiary Rouse Services LLC ("Rouse Defendants" or "Rouse"), and several of the largest construction equipment rental companies in the United States, which include United Rentals, Inc., Sunbelt Rentals, Inc., Herc Rentals Inc., Herc Holdings Inc., H&E Equipment Services, Inc., and Sunstate Equipment Co., LLC (collectively referred to as the "Rental Company Defendants" or, including the Rouse Defendants,

the "Defendants"), by conspiring to artificially increase construction equipment rental prices nationwide.

## I.     NATURE OF THE ACTION

1.     This action arises from an unlawful agreement between Defendants—which include some of the largest construction equipment rental companies in the United States—to artificially increase and fix the prices of rental construction equipment used in residential and commercial construction projects throughout the United States.

2.     The rental equipment at issue is used in commercial and residential construction projects, and includes equipment such as excavators, backhoes, bulldozers, skid steers, compaction equipment, loaders, and lifts.

3.     Upon information and belief, the Rental Company Defendants entered into an unlawful agreement with Rouse to effectuate their price fixing conspiracy.  This conspiracy has artificially inflated the cost of renting construction equipment to individuals and entities like Plaintiff.

4.     Defendant Rouse created a benchmarking platform that collects competitively sensitive information ("CSI") from its clients, including the Rental Company Defendants, on a daily basis and provides benchmark reports back to its clients that include rental rates, fleet utilization information, and other key performance metrics.

5.     Rouse markets this benchmarking platform as a means for construction rental equipment providers to easily compare rental and fleet utilization rates and optimize their business. However, it is in fact just a means to effectuate their unlawful price-fixing conspiracy.

6.     Rouse, through this benchmarking program, enables the Rental Company Defendants to raise, fix, and stabilize the rental prices for construction equipment throughout the United States.

7.     The Rental Company Defendants use the Rouse data to collude in setting their prices, even when market pressures would have normally resulted in price reductions.  Defendants refer to this a "price discipline" but it is evidence that the Rental Company Defendants agreed that they would not compete with each other on the basis of price.

8.     Defendants have been extremely successful as a result.  Rental Company Defendants have been increasing their rental prices and collecting record revenues year after year. And Rouse itself now has more than 400 construction equipment rental clients as subscribers, which has become the go-to benchmarking system used by the industry.

9.     The lack of competition has caused Plaintiff and members of the Class harm in the form of supracompetitive prices for Rental Equipment during the Class Period.  Plaintiff brings this class action Complaint against Defendants for violations of Section 1 of the Sherman Antitrust Act.

10.    Plaintiff seeks to represent a class consisting of persons and entities who rented construction equipment in the United States from at least as early as March 31, 2021, through the present (the "Class Period") from the Rental Company Defendants.

## II.    PARTIES AND UNNAMED CO-CONSPIRATORS

### A.    Plaintiff

11.    Plaintiff McGinnis Construction Co, Inc. is a construction company incorporated and headquartered in Madison Heights, MI, doing business as "McGinnis Construction" (hereinafter "Plaintiff" or "McGinnis").  McGinnis provides homeowners and customers across

southeast Michigan with commercial and residential construction, remodeling and renovation services. McGinnis regularly rents construction equipment from several large construction equipment rental companies, including one or more Defendants.

**B.     Rouse Defendants**

12.     Defendant RB Global, Inc. ("RB Global") is a publicly-traded company, listed on the Toronto and New York Stock Exchanges, with its legal domicile in Canada and its headquarters located at 2 Westbrook Corporate Center, Suite #1000, Westchester, Illinois 60154.

13.     Defendant Rouse Services LLC ("Rouse Services") is a wholly-owned subsidiary of RB Global (collectively "Rouse" or "Rouse Defendants"), with its headquarters at 8383 Wilshire Boulevard, Suite 900l, Beverly Hills, California 90211.  Rouse was acquired by RB Global for $275 million in 2020.

**C.     Rental Company Defendants**

14.     Defendant United Rentals, Inc. ("United Rentals") is a publicly-traded company, incorporated in Delaware, with its principal place of business at 100 First Stamford Place, Suite 700, Stamford, CT 06902.  United Rentals, Inc. is principally a holding company and conducts its operations through its wholly owned subsidiary, United Rentals (North America), Inc., and its subsidiaries.

15.     United Rentals is the largest equipment rental company in the world, with over 1,400 retail locations across North America. United Rentals maintains approximately 20% of the nationwide market for equipment rentals.

16.     United Rentals has earned increasing profits year after year. Rental revenue for the fourth quarter of 2024 increased 9.7% year-over-year to a fourth quarter record of $3.422 billion.

In 2024, the company also earned an annual gross profit of $6.15 billion, marking a 5.8% increase from $5.813 billion in 2023.

17.     United Rentals' annual revenue for 2024 was $15.345B, a 7.07% increase from 2023. Its annual revenue for 2023 was $14.332B, a 23.11% increase from 2022, and annual revenue for 2022 was $11.642B, a 19.82% increase from 2021.[1]

18.     United Rentals' annual gross profit for 2024 was $6.15B, a 5.8% increase from 2023. In 2023, annual gross profit was $5.813B, a 16.35% increase from 2022. And in 2022, annual gross profit was $4.996B, a 29.67% increase from 2021.[2]

19.     United Rentals has a history of engaging in acquisitions to increase its footprint in the market.[3] In 2012, United Rentals acquired competitor RSC Holdings Inc. ("RSC"), which at the time was one of the largest construction rental companies, for $4.2 billion.[4] In 2017, United Rentals acquired NES Rental Holdings II, Inc. ("NES"), for $965 million, and NEFF Corporation ("NEFF"), for $1.3 billion.[5] At the time, NES and NEFF were among the top ten rental companies in the country, and both were original participants in the price fixing conspiracy since its inception in 2011. In 2018, United Rentals completed several more acquisitions, including BlueLine Rental for $2.1 billion.[6] In 2021, United Rentals acquired, among other companies, Franklin Equipment,

---

[1] *United Rentals Revenue 2010-2024 | URI*, Macrotrends, at https://www.macrotrends.net/stocks/charts/URI/united-rentals/revenue
[2] *United Rentals Gross Profit 2010-2024 | URI*, Macrotrends, at https://www.macrotrends.net/stocks/charts/URI/united-rentals/gross-profit.
[3] United Rentals, *TIMELINE: Acquisition History*, at https://www.unitedrentals.com/our-company/about-us/acquisition-history.
[4] United Rentals, *United Rentals Completes Acquisition of RSC Holdings* (Apr 29, 2012), https://www.unitedrentals.com/our-company/press-room/press-releases/detail/united-rentals-completes-acquisition-rsc-holdings.
[5] *Id.*
[6] *Id. See also* United Rentals, *United Rentals to Acquire BlueLine Rental for $2.1 billion* (Sep. 10, 2018), at https://www.unitedrentals.com/our-company/press-room/press-releases/detail/united-rentals-acquire-blueline-rental-21-billion.

LLC.[7]  In 2022, United Rentals completed its acquisition of Ahern Rentals, Inc. for $2 billion.[8]

United Rentals touted that "[t]he transaction adds approximately 2,100 employees, 60,000 rental

assets and 106 locations to United Rentals in the United States."[9]  And in 2025, United Rentals

also sought to acquire Defendant H&E, but has since withdrawn from that acquisition.[10]

20.     Defendant Sunbelt Rentals, Inc. ("Sunbelt Rentals") is a North Carolina corporation

and has its principal place of business at 1799 Innovation Point, Fort Mill, North Carolina 29715.

Sunbelt Rentals is second largest equipment rental company in the country, with more than 1,200

locations in the U.S. and 14,000 types of equipment for rent.[11]

21.     Ashtead is an international equipment rental company with national networks in the

US, UK and Canada, trading under the name Sunbelt Rentals.  Ashtead Group owns and operates

Sunbelt Rentals, Inc.[12]  In 2024, Sunbelt Rentals reported $9.3 billion in revenue from its U.S.

business alone.  Sunbelt Rentals reported that "[r]ental revenue in the US grew by 11% over last

year to $8,321m, which was on top of growth of 24% the previous year."[13]

22.     Sunbelt Rentals has also adopted a strategy of growth by acquisition.[14]  Over the

past several years, Sunbelt Rentals has made well over 150 acquisitions.[15]

---

[7] United Rentals, *United Rentals Acquires Franklin Equipment* (Apr 14, 2021), at https://www.unitedrentals.com/our-company/press-room/press-releases/detail/united-rentals-acquires-franklin-equipment.

[8] United Rentals, *United Rentals Completes Acquisition of Ahern Rentals* (Dec. 7, 2022), at https://investors.unitedrentals.com/press-releases/press-releases-details/2022/United-Rentals-Completes-Acquisition-of-Ahern-Rentals/default.aspx.

[9] *Id.*

[10] United Rentals, *United Rentals, Inc. Will No Longer Pursue the Acquisition of H&E Equipment Services, Inc.* (Feb. 18, 2025), at https://investor-relations.unitedrentals.com/press-releases/press-releases-details/2025/United-Rentals-Inc.-Will-No-Longer-Pursue-the-Acquisition-of-HE-Equipment-Services-Inc/default.aspx.

[11] Sunbelt Rentals, *About Sunbelt Rentals*, at https://www.sunbeltrentals.com/about/.  *See also* Ashtead Group, *Ashtead Group US*, at https://www.ashtead-group.com/our-businesses/us/.

[12] Ashtead Group, *Ashtead Group At A Glance*, at https://www.ashtead-group.com/about-us/at-a-glance/.

[13] Ashtead Group, *Ashtead Group Annual Report & Accounts 2024*, p. 9, available at https://www.ashtead-group.com/investors/.

[14] *Id.* at p. 15 ("Much of our market share gain comes from these small independents when we set up new stores or acquire them, and hence our runway remains long with ample opportunity for bolt-on investments.")

[15] *See, e.g.*, Michael Roth, *Sunbelt Rentals Makes 16 Acquisitions in Fiscal First Half and More in November*, Rental Equipment Register (Dec. 10, 2023), at https://www.rermag.com/mergers-acquisitions/rental-companies/article/21278915/sunbelt-rentals-makes-16-acquisitions-in-fiscal-first-half-and-more-in-november;  and

23.     Defendants Herc Holdings Inc. is the parent company of Herc Rentals Inc. (together, "Herc Rentals" or "Herc").   Both companies are incorporated under the laws of Delaware with their principal place of business located at 27500 Riverview Center Boulevard, Bonita Springs, Florida 34134. Herc Holdings Inc. is a publicly traded company listed on the NYSE.

24.     Herc Rentals has over 451 locations in the U.S. and Canada, and its fleet represents a total original equipment cost of $7 billion.

25.     Herc Rentals' equipment rental revenue increased by 24% in 2021, 34% in 2022, 12% in 2023,[16] and 11% in 2024.[17]

26.     Herc Rentals has also embraced acquisition as a strategy for growth in the industry:

> We are a market consolidator, having completed 42 strategic acquisitions since launching our M&A strategy in December 2020. Today, we operate from approximately 400 physical branches, representing greater market penetration with approximately 50% more locations since becoming a standalone company in 2016.[18]

27.     Herc and United Rentals had recently been involved in a bidding war for Defendant H&E, discussed below.

28.     Defendant H&E Equipment Services, Inc. ("H&E") is a publicly-traded company incorporated in Delaware with its principal place of business at 7500 Pecue Lane, Baton Rouge, Louisiana 70809. H&E was founded in 1961 and is one of the largest equipment rental companies in the U.S., with more than 160 locations.[19]

---

Michael Roth, *Sunbelt Rentals Makes 26 Acquisitions in Fiscal 2024, Adds Chicago's Rentalmax in May: Sunbelt Rentals and its parent company Ashtead plc acquired 26 rental businesses during fiscal 2024, for total cash of $845.6 million*, Rental Equipment Register (June 22, 2024).
[16] *Herc Holdings Inc. 2023 Annual Report*, available at
https://s29.q4cdn.com/503541803/files/doc_financials/2023/ar/2023-annual-report.pdf.
[17] *Herc Holdings, Inc. 2024 Annual Report,* available at
https://s29.q4cdn.com/503541803/files/doc_financials/2024/ar/HRI-2024-Annual-Report.pdf, at p. 28
[18] *Id.* at p. 1.
[19] H&E Rentals, *H&E Rentals About Us*, at https://he-equipment.com/our-company/about-us.

29.    In 2023, H&E's total equipment rental revenues increased $230.1 million, or 24.1%, to $1.2 billion from $956.0 million in 2022. H&E credited this increase primarily to its "larger fleet and increased rental rates as compared to the prior year."[20] In 2024, H&E's total equipment rental revenues increased another 5.7%, to $1.3 billion.[21]

30.    In January 2025, United Rentals and H&E entered into an Agreement and Plan of Merger. But in February 2025, H&E received a "superior proposal" from Herc and the Agreement with United Rentals was terminated.[22] The proposed merger between H&E and Herc is under regulatory review by the United States Federal Trade Commission.

31.    Defendant Sunstate Equipment Co., LLC ("Sunstate") is a Delaware company with its principal place of business at 5552 E. Washington Street, Phoenix, Arizona 85034. Sunstate is wholly-owned by the Sumitomo Corporation Group, which is a publicly-traded company on the Tokyo Stock Exchange and is also listed on the NYSE through an American Depositary Receipt.

32.    Sunstate Equipment was founded in 1977, and in 2017, was No. 7 on the Rental Equipment Register[23] top 100 list of rental companies ("RER 100"). The company has approximately 100 branches in sixteen states. As with the other Defendants, Sunstate has made strategic acquisitions of other rental companies over the years and has experienced growth in its revenue and profits over the past several years.

---

[20] *H&E 2023 Form 10-K Annual Report for Year Ending Dec. 31, 2023*, at https://www.sec.gov/ix?doc=/Archives/edgar/data/1339605/000095017024018750/hees-20231231.htm#item_7_mgmt_discussion_and_analysis.

[21] *H&E Rentals Reports Fourth Quarter and Full Year 2024 Results* (Feb. 21, 2025), at https://investor.he-equipment.com/news-releases/news-release-details/he-rentals-reports-fourth-quarter-and-full-year-2024-results.

[22] *H&E Equipment Services, Inc. Receives Superior Proposal from Herc Holdings Inc*. (Feb. 18, 2025), at https://investor.he-equipment.com/news-releases/news-release-details/he-equipment-services-inc-receives-superior-proposal-herc.

[23] The Rental Equipment Register is a trade publication that includes a website, magazine, blog, newsletters, and other material that focuses on the construction rental industry. *See* https://www.rermag.com/.

### D.    Unnamed Co-Conspirators

33.    Various co-conspirators, known and unknown, willingly participated in and acted in furtherance of the alleged conspiracy.  Each Defendant was a co-conspirator with each of the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in the United States and in this District.  Defendants are liable for acts done in furtherance of the alleged conspiracy by their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions.

34.    At all relevant times, other known and unknown corporations, individuals, and entities willingly conspired with Defendants in their unlawful and illegal conduct. Numerous individuals and entities participated actively during the course of, and in furtherance of, the scheme described herein.  The individuals and entities acted in concert to advance the objectives of the scheme to benefit Defendants and themselves through the manipulation of rental prices.

## III.    JURISDICTION AND VENUE

35.    This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 16 of the Clayton Act (15 U.S.C. § 26). This action seeks compensatory damages, treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees.

36.    This Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

37.    This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A).

38.    A substantial part of the events or omissions giving rise to the claims occurred in this District.  Upon information and belief, each Defendant resides, transacts business, is found, or has an agent in this District.

39.     Defendants' activities were within the flow of and were intended to and did have a substantial effect on, interstate commerce of the United States.  Defendants' products and services are sold in the flow of interstate commerce.

40.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiff and the Class members. Defendants, directly and through their agents, engaged in activities affecting all states.

41.     Defendants' conspiracy, wrongful anticompetitive conduct and resulting substantial anticompetitive effects described herein proximately caused injury to Plaintiff and members of the proposed Class.

42.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C.§ 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.     FACTUAL ALLEGATIONS

### A.     The Construction Equipment Rental Market

43.     The construction equipment rental market makes up a large segment of the construction industry in the United States. Renting offers customers flexibility and makes it simple for businesses to scale their equipment requirements in accordance with project specifications. Customers can also access a large variety of equipment without having to worry about the costs of maintenance and storage, depreciation or making large capital outlays.

44.     The term "Construction Equipment" is normally used in the construction industry to refer to large, heavy equipment and components of such equipment, but is not limited to lifts,

dozers, excavators, hoes, steers, compaction equipment, cranes, and loaders. Smaller tools are also included in this market. Construction Equipment may be used in commercial and residential construction, as well as industrial sectors.

45.    Demand for rental Construction Equipment is significant and growing. Construction Equipment rental companies now purchase approximately one-third of all new Construction Equipment sold in North America. In 2024, the United States' market for construction and general tool rentals totaled $83.7 billion, which was 8% greater than 2023. The industry is projected to grow another 5.2% in 2025.[24]

### 1.    The Construction Equipment Rental Market Consolidates

46.    In the early 2000s, the Construction Equipment rental industry was made up of a large number of independent companies who engaged in price competition with each other to attract customers. This competition led to lower prices and resulted in periods of broad price declines.

47.    As detailed above the Construction Equipment rental market has become increasingly concentrated, as companies acquired competitors to increase their size and market penetration.

48.    The chart below is taken from a presentation by Ashtead Group (owner of Defendant Sunbelt) to its investors. This chart illustrates how much the industry has consolidated since 2010, and does not include United Rentals' acquisition of RSC.[25]

---

[24] Lauren Mau, *ARA's latest US and Canada economic forecast released at The ARA Show*, ARA Rental Management (Jan. 30, 2025), at https://news.ararental.org/aras-latest-us-and-canada-economic-forecast-released-at-the-ara-show.
[25] Ashtead Group, Results and presentations, *Unaudited results for the half year and second quarter ended 31 October 2023 Presentation Slides* (Dec. 5, 2023), at https://www.ashtead-group.com/investors/results-centre/results-and-presentations/.



49.     Today, the market is even more concentrated and Rental Company Defendants have a majority share of the construction equipment rental market in the U.S., and the market is predicted to consolidate even further.[26]



---

[26] Ashtead Group, Results and presentations, *Unaudited results for the nine months and third quarter ended 31 January 2025 Presentation Slides* (Mar. 4, 2025), at https://www.ashtead-group.com/investors/results-centre/results-and-presentations/.

2.    **Prior to the Introduction of Rouse Rental Insights, Rental Companies Set Their Prices Independently**

50.    Before Rouse's entry into the Construction Equipment rental industry, rental companies used their own analysis of their cost, supply and demand driven factors to independently set the pricing for rental of their Construction Equipment.

51.    Historically, Construction Equipment rental companies' pricing models were fairly straightforward and generally resulted in prices for daily, weekly, and monthly rentals. Prices tended to remain stable, although increased competition or other market forces sometimes accounted for substantial price changes.

52.    The introduction of the Rouse pricing platform revolutionized the industry pricing models by allowing competitors to pool their CSI and use that information to charge supra-competitive prices to Plaintiff and members of the Class.

B.    **Alarmed by Industry Trends, Rental Company Defendants Seek a Different Pricing Mechanism**

1.    **"Pricing Pain" Leads to "Pricing Discipline"**

53.    In 2009, the rental industry experienced price volatility and continuing declines in pricing.  Rental industry consultant and former Herc President Dan Kaplan "said that rate declines were being fed by a lack of discipline; 'not only by the larger rental companies but also by the independent firms. Effectively, we are beginning to see a rental rate war in which everyone loses.'"[27]

54.    Kaplan was a frequent critic of the pricing trends he saw in the industry.  In 2010, Kaplan again discussed the downward price pressure and competition.[28]  He stated that to stabilize

---

[27] Murray Pollok, *North American 'rates war' starting warns Kaplan*, KHL Group LLP (May 14, 2009), available at https://www.khl.com/1037013.article (internal quotation marks removed).

[28] *Positioning for 2011*, Rental Equipment Register (Jan. 15, 2010), available at https://www.rermag.com/news-analysis/interviews/article/20944213/positioning-for-2011.

the industry, it would be beneficial if one company could acquire "significant market share" to "be able to take action to drive pricing on their own behalf. That would be constructive for the industry."[29]

55.    Later than year, Kaplan was even more explicit in his call for industry leadership on pricing.[30]

> The pricing pain that is being felt throughout the equipment rental industry right now is largely self-inflicted. Poor rate management caused it, and proper rate management can stop it. . . .  I am challenging the entire rental industry to show leadership on rates, and every company to take a critical look at its rate practices, or risk failing itself and the industry. . . .  ***Fortunately, there is a wealth of technology available today to help manage rental rates. If utilized properly, with tiered checks and balances, these software programs can bring genuine discipline to rate management***. . . .  The traditional thinking is that when you price, you hope the competition follows, while expecting that they won't. But this is not a traditional time, and ***the entire industry must accept rate responsibility together***. . . .  Right now, the industry has an opportunity to move toward a more profitable rate platform, using the fulcrum of current capacity and increased demand.[31]

56.    Kaplan's call for coordinated conduct was met with approval by the industry.  An article in the Rental Equipment Register noted that "[t]he comments and emails we have seen in regard to Dan Kaplan's column last month on the rental rate suicide this industry seems determined to commit shows that he touched a few nerves on the topic"  and offered a justification for "rate discipline": "In a way, continually slashing rates and using rate discounting as a method to sell your business means selling the industry short, not valuing the contributions you are making to your customers' businesses."[32]

---

[29] *Id.*

[30] Dan Kaplan, *The Clock Is Ticking on Rate Discipline*, Rental Equipment Register (Sept. 1, 2010), available at https://www.rermag.com/business-technology/business-info-analysis/article/20937427/the-clock-is-ticking-on-rate-discipline.

[31] *Id.* (emphasis added).

[32] Michael Roth, *Rental Rates Endanger Progress of Rental Industry: The comments and emails we have seen in regard to Dan Kaplan's column last month on the rental rate suicide this industry seems determined to commit shows*, Rental Equipment Register (Oct. 1, 2010), available at https://www.rermag.com/business-technology/business-info-analysis/article/20942889/rental-rates-endanger-progress-of-rental-industry.

## 2.    Rouse Responds to the Call for a "Pricing Discipline" Mechanism

57.    Rouse originally specialized in the auctioning of used construction equipment. However, in or around 2000 Rouse exited the auction market to focus instead on the information services sector in the construction industry.

58.    In 2008-2009, Defendants United Rentals, Herc, and H&E, approached Rouse to ask if it would create a benchmarking service focused on the Construction Equipment rental market. These companies thought that Rouse could create the means to allow rental companies to pool their data and provide them with greater insight. As a Rouse Senior Vice President explained:[33]

> It was really in the 2008/2009 time frame that we talked with a number of the different rental companies and we saw an opportunity to do something like the valuation benchmarking that we were doing on used equipment but on their core rental business and give them measurable benchmarks for rental rates and utilization.  So we launched that service in 2011 with five companies.

59.    In 2011, the American Rental Association ("ARA") started publishing "Rental Market Metrics," which established consistent metrics that allowed any Construction Equipment rental company "to compare itself to every other rental business regardless of size."[34]  Rouse "was instrumental in helping to develop" the ARA Rental Market Metrics.[35]

---

[33] The Rental Journal Podcast, *Episode #135 – Phil Mause*, at https://www.therentaljournal.com/podcast-episodes/phil-mause.

[34] John McClelland, *Measure Performance for Maximum Gain: The American Rental Association defines the key elements of rental metrics in attempt to unify the assessment and comparison of rental business performance*, ForConstructionPROS.com  (Jun. 26, 2013), at https://www.forconstructionpros.com/business/article/10977481/the-american-rental-association-provides-guide-for-assessment-of-rental-business-performance.

[35] Michael Roth, *Rouse Asset Services offers Rental Metrics Benchmark Service*, Rental Equipment Register (Dec. 1, 2012), available at https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offers-rental-metrics-benchmark-service.

60. Rouse then used the ARA criteria to create its benchmarking platform.[36]  Only a month after the ARA released their Rental Market Metrics, Rouse launched its service with five rental companies.

61. Rouse's service collects "actual rental invoices and daily fleet snapshots" from its clients.[37]  Rouse uses this pooled CSI data to feed its algorithmic pricing tool to generate a real-time Rouse Rental Insights Price ("RRI Price") for each piece of rental equipment.

62. The Rouse platform initially provided Construction Equipment rental companies "an overview of [a] firm's rental metrics for free" in exchange for providing the rental companies' CSI to Rouse.[38]  Rouse later expanded its services, offering a subscription service to its rental company clients that provided more in-depth information and encompassed all of the ARA Rental Market Metrics by equipment type.[39]

63. This was the foundation for the price fixing conspiracy.  Defendants United Rentals, Herc Rentals, and H&E participated as founding members of Rouse Rental Insights ("RRI") and the price fixing conspiracy (the other two founding members, NES Rentals and NEFF Rentals, were subsequently acquired by Defendant United Rentals). All of these founding companies allowed Rouse to collect their competitively sensitive data, and they began sharing and pooling their CSI with Rouse.

C.    **Rental Company Defendants and Other Rental Companies Agree to Share CSI With Rouse to Generate Collective Pricing**

---

[36] *Id.*
[37] Rouse Services, https://www.rouseservices.com/solutions/rental-insights/#:~:text=Rouse%20uses%20actual%20rental%20invoices,each%20market%20they%20operate%20in.
[38] John McClelland, *Measure Performance for Maximum Gain*, *supra.*
[39] *Id.*

64.    By 2015, Rouse's RRI price had become a pervasive and significant benchmark for pricing in the Construction Equipment rental industry.  More than fifty rental company clients had signed up to use the Rouse's benchmarking service, which included the RRI price that was generated by collecting and pooling rental companies' CSI.[40]

65.    To encourage additional rental companies to participate, Rouse offered its basic product at no cost, but only in exchange for each respective rental company's CSI.

66.    Rouse touted the success of its benchmarking service.:

We long believed that rental companies needed a way to measure performance on rental rates and key operating metrics, and we're proud to have collaborated with the ARA Rental Market Metrics standard that is utilized in our Rental Metrics Benchmark Service. . . .  The rapid growth of our Rental Metrics Benchmark Service demonstrates how valuable this information is to rental companies, and we're looking forward to additional growth here in the U.S. and internationally.

Through its Rental Metrics Benchmark Service, Rouse Analytics collects invoice level transaction data and nightly fleet snapshots from participating rental companies and reports industry benchmarks for rental rates, physical utilization, dollar utilization, fleet age and other key performance metrics at a local market level. Participating rental companies receive a summary level comparison of their rental rates and other key performance metrics to local market benchmarks every month at no charge and then have the option to purchase more detailed reporting.[41]

67.    Ritchie Brothers, "the world's largest heavy equipment auctioneer and provider of end-to-end services," was also selling data analytics to the auction industry.[42]  In December 2020, Richie Brother acquired Rouse.[43] This acquisition allowed Rouse to combine its own data analytics

---

[40] *Rouse Analytics Rental Benchmark Service Tops 50 Participants*, Rental Equipment Register (Feb. 17, 2015), at https://www.rermag.com/news-analysis/headline-news/article/20950099/rouse-analytics-rental-benchmark-service-tops-50-participants.
[41] *Id.*
[42] Michael Roth, *Ritchie Brothers Market Reports Shows Steady 2020 Used Equipment Pricing*, Rental Equipment Register (Dec. 15, 2020), at https://www.rermag.com/news-analysis/headline-news/article/21144957/ritchie-brothers-market-reports-shows-steady-2020-used-equipment-pricing.
[43] Michael Roth, *Ritchie Bros.' Acquisition of Rouse Services Finalized*, Rental Equipment Register (Dec. 9, 2020), at https://www.rermag.com/mergers-acquisitions/article/21149978/ritchie-bros-auctioneers-ritchie-bros-acquisition-of-rouse-services-finalized. Richie Brothers changed its name to RB Global in 2023.

platform and client base with the data from Ritchie Brothers. As a result, Rouse was able to provide its customers with even more comprehensive data.

68.     Rouse's clients have consistently dominated the Rental Equipment Register list of the top 100 rental companies ("RER 100").  By 2022, Rouse's clients accounted for the vast majority of the RER 100's total revenue.  Two years later, all of the ten largest Construction Equipment rental companies, and 70 of the top 100, were using Rouse's RRI.  Overall, more than 400 companies in North America use Rouse RRI.

### D.     Industry Participants Credit Rouse for "Pricing Discipline" and Increased Prices

69.     Rouse's rental company clients have lauded Rouse's platform for increasing and stabilizing rental rates.  A former CEO of one of the smaller rental companies discussed Rouse's impact on the industry:[44]

> "I don't believe we're in a race to the bottom, not anymore at least. Rouse has essentially standardized a lot of the price competition in the industry. Since their involvement, rates have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices."[45]

70.     A VP of Sales Analytics at Sunbelt explained: "We leverage Rouse in a number of ways really[,] rate and utilization are the most important ways ."  He also noted that what Sunbelt found most valuable is "understanding where we sit in the marketplace[,] whether we are overperforming or underperforming to allow us to make adjustments."

---

[44] *Sunbelt vs United: the Nature of Equipment Rental Competition, Former CEO of Nickell Rental*, IP In Practice Interview (Feb. 1, 2024), at https://inpractise.com/articles/sunbelt-vs-united-the-nature-of-equipment-rental-competition.
[45] *Id.*

71.    In 2024, A former CEO of a company which was acquired by Sunbelt explained how the price fixing conspiracy allowed participants to exchange CSI and utilize the information to raise prices:

> Rouse has essentially standardized a lot of the price competition in the industry. Since their involvement, rates have significantly increased. The larger rental companies, in particular, have become more stable in their pricing and show a desire to increase prices.[46]

The former CEO explained that rental companies strived "to stay within the [RRI pricing] band." He added that their goal was to set their prices "above or at the average, depending on their position." He estimated that prices to rent larger pieces of equipment had increased approximately 30% to 40% over the 2021-2024 time period.

72.    Defendants continue to urge pricing discipline in 2024. Matthew Flannery, CEO of United Rentals, believed that "the industry is showing good discipline," and that pricing discipline has been a necessity because of rising equipment prices, stating "I would imagine if we see the rising [equipment] prices, I can't even imagine how anyone would consider that going negative on pricing would even be a reasonable these or financially feasible."[47]

73.    Similarly, Sunbelt was touting how the "structural change" of "larger, experienced, capable rental companies ... [getting] disproportionately larger" led to "[p]ricing discipline and progression."[48]

74.    Herc also acknowledged the role of pricing discipline in its recent success. "This year's operating performance really emphasizes the advantages of Herc's mega project

---

[46] The Capitol Forum, *RB Global's Rouse Services Could Face Antitrust Scrutiny Over Information Sharing as Enforcers Target Third-Party Benchmarking* (Dec. 23, 2024)**,** available at https://thecapitolforum.com/rb-globals-rouse-services-could-face-antitrust-scrutiny-over-information-sharing/.

[47] Michael Roth, *United Rentals' Flannery Expects Continuing Growth Trends, Strong Capex in 2024* Rental Equipment Register **(**Jan. 28, 2024), available at https://www.rermag.com/news-analysis/headline-news/article/21281628/united-rentals-flannery-expects-continuing-growth-trends-strong-capex-in-2024.

[48] Ashtead Group Full Year Results (Jun. 18, 2024), available at https://www.ashtead-group.com/files/downloads/InvestorCentre/2024/AshteadGroupplc_Q4-23-34-presentation_.pdf, at 5.

participation, customer project and geographic diversity, specialty equipment and services, strategic acquisitions, and, of course, pricing discipline."[49]

75.    Defendants continued to extol pricing discipline into 2025. Industry analysts expect United Rentals "will focus on maintaining pricing discipline to offset any seasonal softness."[50]

76.    In a recent call with analysts to discuss Herc's 2025 first quarter earnings, Larry, Silver, the President and CEO, assured everyone that "we continue to feel...comfortable that there is discipline."[51]

77.    Rouse regularly announced how many rental companies had signed up for its services.[52] As each client joined, they agreed to provide their CSI to Rouse in exchange for their competitors' data, which would allow them to confidently raise their rental prices in line with their competition.

V.    **DEFENDANTS' UNLAWFUL SCHEME**

A.    **Defendants' Exchange of Confidential Sensitive Information Violates the Sherman Act**

78.    The Rental Company Defendants entered into a horizontal agreement among and between themselves to establish the price fixing conspiracy, which allows the participants to limit

---

[49] Michael Roth, *Herc Rentals Urban Market Growth Strategy Outpacing the Rental Industry, CEO Silber Says*, Rental Equipment Register (Oct. 27, 2024), available at https://www.rermag.com/news-analysis/headline-news/article/55238530/herc-rentals-urban-market-growth-strategy-outpacing-the-rental-industry-ceo-silber-says.
[50] Zacks Equity Research, *Factors Setting the Tone for United Rentals' Q4 Earnings* Yahoo Finance (Jan. 27, 2025), https://finance.yahoo.com/news/factors-setting-tone-united-rentals-160400357.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAACXXI5hyST5EiFkSGvOXVknVXf8khiJzR0eaGdDloRgPVPnbvhe2S0mr0zK9bKTs0h2aWVBjhLjhD3ijrS8RdoNszpuQzzpL_qHzLdW2yzmnJfMjxYHqT2PcyP_4w2ukD-QEyUIn314JBkWPTpSL0WLG0cM0NLBjeL91LwJAwJ9N.
[51] *Earnings Call Transcript: Herc Holdings Q1 2025 misses EPS, stock down*, Investing.com (Apr. 22, 2025), available at https://www.investing.com/news/transcripts/earnings-call-transcript-herc-holdings-q1-2025-misses-eps-stock-down-93CH-3996068.
[52] *See, e.g.*, *Rouse Services Added 60 New Customers, Appraised More Than $50B in 2022*, Monitor Daily (Mar. 7, 2023), at https://www.monitordaily.com/news-posts/rouse-services-celebrates-record-breaking-customer-growth-launches-fleet-manager/.

competition and raise prices, by using a mutual exchange of their CSI with Rouse—and each other—to facilitate coordination between them.

79.    Rouse requires participants in the price fixing conspiracy to provide their CSI to Rouse in exchange for receiving competitor pricing and other data from Rouse.  Rouse "pull[s] data directly from [its] clients' systems" and "uses actual rental invoices and daily fleet snapshots from over 400 companies across North America . . . to provide clients with comparisons of the rental rates, utilization, and other key performance metrics to industry benchmarks by Cat Class specific to each market they operate in."[53]  The use of actual rental invoices ensures that the pricing information provided to its clients is more accurate than using list rates or quoted rates, which are not always utilized.

80.    Rouse pools together the CSI it has collected from Rental Company Defendants and provides it to Rouse's clients, including the Rental Company Defendants, with the same Rouse Rental Insights price ("RRI Price") for each piece of rental equipment.[54]

81.    Rouse calculates the RRI Price using a proprietary formula which analyzes clients' pooled CSI data, and Rouse's assessment of seasonality of demand and view of market conditions.

82.    Rouse discourages price competition by enabling its clients to set prices at or above the reported RRI Price.  This creates upward price pressure on rental prices from all of Rouse's rental company clients.

83.    Rouse tries to mask its anticompetitive conduct by calling the RRI Price a "benchmark" rather than referring to its true nature: a tool for the Rental Company Defendants to effectuate their price fixing conspiracy.

---

[53] *See* Rouse Services, *Rouse Rental Insights*, at https://www.rouseservices.com/solutions/rental-insights/.
[54] *See Rouse Asset Services offers Rental Metrics Benchmark Service*, Rental Equipment Register (Oct. 1, 2012), at https://www.rermag.com/business-technology/business-info-analysis/article/20938084/rouse-asset-services-offers-rental-metrics-benchmark-service.

84.     A benchmark is typically a tool used to measure past performance.  However, in this case Rouse includes a recommended RRI Price, which enables Defendant Rental Companies to set a common price going forward and avoid competing on price.

85.     One article touting Rouse's "benchmark" service explains how specific the pricing data it provides, which allows competitors to know exactly how to price their products:

> "It's one thing to tell your managers and sales staff they need to bring their rates up, but quite another to tell them with certainty they are 12-percent below average for the market in generators, 14-percent below market average in mid-sized skid-steer loaders, and 17-percent below market average in 19-foot scissor lifts and tell them the exact amount of the average rate."[55]

86.     Rouse markets its software and data analytics platform (including its RRI Price) to Construction Equipment rental companies by touting their customers' ability use the platform to increase profitability.  Rouse claims its "multi-layered approach presents an unprecedented view" of their customers' "complete revenue stream, enabling [them] to benchmark against industry averages from the beginning to the end of [each] asset's lifecycle."[56]  They also claim that with their "comprehensive data and analytics, [customers] can proactively adapt to market changes, optimize asset utilization, and maximize profitability throughout [their] business journey."[57] This is just shorthand for enabling a price fixing scheme through sharing confidential data, including pricing with their competitors.

87.     The Rental Company Defendants were aware their competitors were also providing their companies' CSI to Rouse and that Rouse was pooling this data and providing it to the Rental Company Defendants for them to use to increase prices to supra-competitive levels.

---

[55] *Id.*

[56] *Introducing Rouse Rental and Equipment Insights: Your Premier Data-Driven Solution for Fleet Performance Benchmarking*, Point-of-Rental    Software,    at    https://www.point-of-rental.com/introducing-rouse-rental-and-equipment-insights-your-premier-data-driven-solution-for-fleet-performance-benchmarking/.

[57] *Id.*

88.    Absent collusion, it would be against any of the individual Rental Company Defendants' unilateral economic self-interest to allow Rouse to collect their highly commercially sensitive information and distribute it to their horizontal competitors. Providing such commercially sensitive information to Rouse to assist competitors in setting their own prices would be in each Rental Company Defendant's economic self-interest **only if** each Rental Company Defendant knew they would in turn receive their competitors' CSI.

### B.    Rental Companies Use the Rouse Data and RRI Price to Unlawfully Raise, Fix, Maintain or Stabilize Rental Prices of Construction Equipment

89.    Defendant Rental Companies use the Rouse data and RRI Price to set their own rental prices.

90.    A Rouse executive noted that a customer can view their own information in a variety of ways:

> So at any moment, if a rental company wants to know how it is doing with 19-foot scissorlifts in Birmingham compared to the competition, or air compressors in Memphis or any piece of equipment in any covered market for any time period, all it takes is a few keystrokes. A company can, also with a few keystrokes, determine how it is faring in physical or dollar utilization, rates, or fleet age compared to its competitors in markets covered by Rouse. It can also determine how it is faring in ancillary revenue categories such as collecting fuel charges, environmental fees, delivery and pickup charges and damage waiver versus its competition.[58]

91.    An executive at Sunbelt touted the benefits of Rouse's data and RRI Price: "We leverage Rouse in a number of ways really... rate and utilization are the most important ways . . . . [T]he most valuable thing Rouse helps us with understanding where we sit in the marketplace[,] whether we are overperforming or underperforming to allow us to make adjustments."[59]

92.    According to the Heavy, a website that uses data to analyze the construction equipment industry, the "primary benefit" of Rouse's "retail rental benchmarking product" is "to

---

[58] See *Rouse Asset Services offers Rental Metrics Benchmark Service*, *supra*.
[59] *Rouse and Sunbelt Rentals - A Strong Partnership*, YouTube, at https://www.youtube.com/watch?v=l7KmTzc29NQ.

ensure business is not lost by being above market rate. Often, for those well below market rate when first using the product, ***it's an opportunity to significantly increase rates***."[60]

93.     A former executive of one of construction rental company (eventually acquired by Defendant Sunbelt) noted the effect of the RRI Price on their industry:

> Over the last few years, its use has become pretty ubiquitous. If you're a mid-size or larger company, you're using Rouse. . . .  Both United and Sunbelt have consistently led in saying, "***We're going to raise prices, we're going to get prices higher***." So, everyone knows what United is doing.[61]

94.     He also noted that companies using Rouse have become "more disciplined" in pricing during periods of declining prices, because they knew "going to the lowest price was not the best strategy."[62]  When asked what had changed over the last decade to make large Construction Equipment rental companies  "so price disciplined," he stated that "tools like Rouse provide them with a safety net when their sales reps claim that prices are falling."[63]

95.     Rouse has partnered with dozens of enterprise resource planning (ERP) software vendors and integrated software partners who worked in other segments of the Construction Equipment rental market to have Rouse RRI integrated into those platforms.  This makes the RRI pricing easily accessible to a wide range of small and mid-sized rental companies. Being fully integrated with these software systems allows for the direct transmission of data to Rouse.

96.     For example, Rouse partnered with Fame Intel, a software company whose platform "handles every aspect of your rentals from reservation to return, which maximizes utilization and return on assets."[64]  In support of the new partnership using Rouse data and analytics, Fame Intel

---

[60] *Glossary: Rouse Services*, The Heavy Beta, at https://www.totheheavy.com/glossary/rouse-services/ (emphasis added).
[61] *Sunbelt vs United: The Nature of Equipment Rental Competition*, *supra*.
[62] *Id*.
[63] *Id*.
[64] Fame Intel, at https://fameintel.com/.

boasted: "Imagine having a cheat code in the equipment rental world. With the Rouse data on your Fame Rental dashboard that's exactly what it would feel like,"[65] and that their integration with RRI would assure their customers "that your pricing is in line with your competition," and to obtain "the ability to see 'who's renting what.'"[66]

97.     Rouse ensures that as many construction rental companies as possible have access to its RRI Price, which allows other market participants to monitor and enforce the RRI pricing, which maximizes the prices charged by the industry as a whole.

98.     Rouse meets with and advises its clients, including Defendant Rental Companies, on how to use the RRI Price and other tools provided by Rouse to achieve higher prices.  One example of this is the Rouse Analytics – Online Dashboard User Guide.[67]  This guide explains how Rouse's online dashboard provides its customers with a wealth of information that allows customers to compare every detail of their business against their competitors to maximize pricing. Among other information provided, it even "[c]ompares [the customers'] invoiced rental revenue to revenue that would have been earned if book rates had been charged on every transaction."[68] Similar comparisons are available for customers' monthly, weekly and even daily rates.[69]  Rouse customers can use the RRI Price to police adherence to their scheme by utilizing alerts and including fields in the software that self-populate.  The sample chart included below shows the rental rates on the left, and a blue bar which reflects actual transactions completed by competitors within that price range. The RRI Price is represented by the line dividing the green and red pricing

---

[65] *Rouse Is in the House: Gain a Competitive Edge with FameAir's Rouse Rental Insights Integration*, Fame Intel (Oct. 31, 2024), at https://fameintel.com/rouse-is-in-the-house/.
[66] *Id.*
[67] *Rouse Analytics – Online Dashboard User Guide*, available at https://rdo.rouseanalytics.com/assets/images/RDO_User_Guide.pdf.
[68] *Id.*
[69] *Id.*

zones. Prices in green indicate that the price is in the top quartile of prices, and red indicates prices are in the bottom quartile.[70]



99.    By allowing all of its customers to see the prices charged, Rouse discourages price competition, and more specifically, the layout of the relevant information is designed to encourage customers to set their prices in the green zone, which is the RRI Price or higher.

100.    Rouse provides pricing comparisons at the customer level as compared to the benchmark price on all key reported metrics, as shown below, which further enables and encourages the policing of the RRI Price.[71]

---

[70] *Id.*
[71] *Id.*



101.    The Rouse RRI also has pages dedicated to each client's sales teams, which include comparisons on each sales representative's performance against the benchmark price.[72]



102.    Rouse also includes a Sales Representative Dashboard that provides summary metrics and comparisons at an individual sales representative level.[73]

---

[72] *Id.*
[73] *Id.*



103.    Indeed, industry analysts have noted the advantages of RRI Price on rental pricing: "There's an argument that these companies might be more disciplined. A few factors contribute to this. First, **there's transparency across the market in pricing and how to optimize pricing**. There's an internal third-party business that provides almost daily rates transparently to the market. So, **when everyone knows the rate in the market, they don't tend to discount heavily.**"[74]

104.    Rouse encourages its clients to utilize this feature to determine whether salespeople are performing as anticipated, by either achieving or underperforming relative to the RRI Price.

105.    Participation in the price fixing conspiracy has paid off for the Rental Company Defendants. The industry publication, Rental Equipment Register ("RER"), puts out an annual list of the top 100 rental companies by rental volume. In 2019, "[t]he new RER 100 totaled $25.2

---

[74] *Ashtead & Equipment Rental*, In Practice (Jun. 29, 2023), at https://inpractise.com/articles/ashtead-and-equipment-rental.

billion, a record total for the listing, and a 15-percent increase over 2018's $21.9 billion."[75]  As of 2021, the RER 100 list of the largest rental companies included 63 companies that are Rouse customers, including eight of the ten largest rental companies.[76]

106.    According to the RER 100 lists, Defendant United Rentals' total rental volume in 2021 increased 14.9% over 2020, and it saw another 23.3% increase in 2022.  Defendant Sunbelt Rentals' 2021 total rental volume increased 15.4% over 2020, and increased another 26.7% in 2022.  Defendant Herc saw a 23.8% increase in rental revenue in 2021, and 33.6% in 2022.  And H&E saw increases of 10.1% and 31%, respectively.[77]

107.    The Rental Company Defendants and Rouse have violated and continue to violate federal antitrust laws. The Rental Company Defendants, who make up a majority of the largest rental companies and control much of the Construction Equipment rental market, do not set their prices independently.  Instead, they outsource that function to a third party, Rouse, in an attempt to make an end run around the antitrust laws.  By their collective actions through Rouse, they have eliminated price competition between and among themselves and artificially increased prices in the Construction Equipment rental market.

108.    Plaintiff and the members of the proposed Class suffered substantial harm from the supracompetitive prices they paid to rent Construction Equipment as a direct and proximate result of Defendants' agreement.  Plaintiff brings this action to recover treble damages, injunctive relief and any other appropriate remedy on behalf of itself and all others similarly situated.

---

[75] Michael Roth, *The 2019 RER 100 Tops $25 Billion: The RER 100 enjoyed a 15-percent rental revenue jump in a record year for the rental elite*, Rental Equipment Register (May 11, 2019), at https://www.rermag.com/rental-news/article/20954702/the-2019-rer-100-tops-25-billion.
[76] *Id.*
[77] *See* Rental Equipment Register, *RER 100* (May 2022), available at https://secure.viewer.zmags.com/publication/c5f1bfef#/c5f1bfef/14; Rental Equipment Register, *RER 100* (April/May 2023), available at https://secure.viewer.zmags.com/publication/9ca3887d#/9ca3887d/20.

**C.    Parallel Conduct and Plus Factors Demonstrate the Existence of a Conspiracy to Fix Prices in the Construction Equipment Rental Market**

109.    As described above, Defendants engaged in various forms of parallel conduct as part of the conspiracy, including: (a) agreeing to use Rouse Services and RRI Prices during the same periods of time; (b) individually providing their CSI to Rouse Service; and (c) using RRI Prices with the understanding that such usage would artificially inflate rental prices of Construction Equipment.

110.    Furthermore, the market for the rental of Construction Equipment is characterized by numerous features, referred to as "plus factors," that render the industry susceptible to collusion, such that the formation, maintenance, and efficacy of a price fixing conspiracy is more likely. These factors include (1) high barriers to entry, (2) high barriers to exit, (3) inelastic consumer demand, (4) market concentration, (5) relative fungibility of construction rental equipment, (6) exchanges of competitively sensitive information among horizontal competitors, and (7) numerous opportunities to collude at events and through trade associations.

111.    The high cost of acquiring construction equipment is a significant barrier to entry. For example, Defendant United Rentals spent billions of dollars per year on the purchase of new rental equipment.[78]  Similarly, Defendant Herc Rentals spent more than one billion dollar in 2023 and again in 2024 on the purchase of new rental equipment.[79] This industry has many other significant barriers to entry, including, for example, the difficulty in finding and affording adequate property and buildings to house a rental business, developing a customer base, funding the costs of maintaining and storing the construction equipment, and finding a team of technicians and

---

[78] United Rentals, Inc., *Form 10-K Annual Report for the Fiscal Year Ended Dec. 31, 2024*, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001067701/0ec70ee1-8f0d-4042-8c2e-e8207d620f61.pdf.
[79] Herc Holdings Inc., *Form 10-K Annual Report for the Fiscal Year Ended Dec. 31, 2024*, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001364479/b9a191fb-d497-4db7-8fae-c6ecc256300d.pdf.

mechanics that can service and maintain the equipment. These barriers deter new entrants into the Construction Equipment rental market.

112.     Companies that rent Construction Equipment also enjoy high exit barriers. Where price escalation is occurring, renters, like the Plaintiff, might not have a lower priced option in reasonable proximity to their current project.  And in this concentrated industry, even if renting the necessary equipment from another rental company were an option, the prevalence of Rouse RRI pricing means there is little to no price competition among Construction Equipment rental companies.

113.     The demand for rental of Construction Equipment is relatively inelastic. The only realistic alternative to renting is buying, which is not financially feasible for most contractors. Thus, no reasonable substitutes exist to discipline rental pricing.

114.     The market for Construction Equipment rentals is highly concentrated. Because of the high barriers to entry, there are a limited number of rental companies, and the market is dominated by the Rental Company Defendants who are all participants in the price fixing conspiracy.

115.     Construction Equipment is relatively fungible. Rental company customers rarely have any additional information that would distinguish one piece of equipment from another when making spending decisions.

116.     Rouse's participating rental companies share competitively sensitive information with one another, both directly and by using RRI as a conduit. As described above, sharing this type of information would be against their independent self-interest absent a conspiracy to collude.

117.      Finally, industry trade associations offer Rouse and participating rental companies additional opportunities to conspire.  For example, Rouse regularly sponsors industry conferences,

and. Rouse and the Rental Company Defendants are all members of the ARA, which offers myriad networking opportunities through national and regional events.[80]

## VI.    THE RELEVANT MARKET

118.    This case alleges a horizontal price-fixing arrangement to fix, stabilize and raise prices of rental equipment.  Price fixing among horizontal competitors is per se illegal and plaintiffs need not allege or define a relevant market.

119.    To the extent a relevant market must be defined, required, the relevant product market here is the market for Construction Equipment rentals.

120.    There are no economic substitutes for Construction Equipment rentals.  Customers cannot purchase Construction Equipment in lieu of renting, given the significant cost incurred to purchase even one piece of Construction Equipment.

121.    Further, construction projects generally require multiple diverse pieces of Construction Equipment.  To purchase even a small number of pieces of construction equipment would cost millions of dollars. Rental companies are responsible for the maintenance and repair of the construction equipment, as well as its storage, which are significant costs that are incurred by construction companies that own their equipment.

122.    By renting Construction Equipment, customers avoid these costs, as well as the significant depreciation associated with owning Construction Equipment, and the cost of insurance policies on the equipment.  Renting allows a company to pay a smaller amount for use of the Construction Equipment, , which frees up capital for other uses.

---

[80] *See*, *e.g.*, American Rental Association, *Calendar of Events*, https://ararental.org/Rental-Pulse/Upcoming-Events.

123.    The relevant geographic market is the United States. The Rental Company Defendants are the dominant sellers of Construction Equipment rentals nationally, transporting equipment across the country on a regular basis.

124.    The U.S. construction rental market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the Small but Significant and Non-Transitory Test ("SSNIP test").  The SSNIP test is a tool used in antitrust analysis to define the relevant market by determining if a monopolist could profitably raise prices by a small but significant amount. If sufficient numbers of customers are likely to switch to alternative products and the lost sales would make such price increase unprofitable, then the market has not been defined properly.

125.    Here, the SSNIP test is satisfied.  Pursuant to the rental companies' agreement not to compete on price, rental companies can increase prices "year over year, between 5% and 12%" in the U.S., yet those increases have not caused sufficient numbers of customers to switch to alternative products such that the SSNIP has become unprofitable to rental companies.

126.    The relevant market for Construction Equipment rentals is corroborated by widespread recognition in the industry that Construction Equipment rental is a distinct market from Construction Equipment sales. Moreover, there is widespread recognition within the industry that the Rental Company Defendants dominate the national market for Construction Equipment rentals. Finally, the market for Construction Equipment rentals has its own pricing system, which is separate from construction equipment sales and driven by the RRI Price.

## VII.    EFFECTS OF DEFENDANTS' ANTICOMPETITIVE SCHEME

127.    The purpose of Defendants' conspiratorial conduct was to increase, fix, or maintain the rental rates in the Construction Equipment rental market in the United States, and, as a direct

and foreseeable result of the conspiratorial conduct, Plaintiff and the Class paid artificially inflated rates to rent Construction Equipment during the Class Period.

128.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury, having paid higher rental rates in the Construction Equipment rental market during the Class Period than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiff and the Class have suffered damages.

129.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

130.    Defendants' anticompetitive conduct had anticompetitive effects that impacted all purchasers in the Construction Equipment rental market.  These anticompetitive effects included: (a) stabilizing, maintaining or fixing the rental rates in the Construction Equipment rental market at artificially high levels, (b) restraining or eliminating competition among Defendants in the Construction Equipment rental market, and (c) depriving Plaintiff and the Class of the benefit of free and open competition.

131.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all companies and entities that rented Construction Equipment in the United States.

132.    By reason of the unlawful activities alleged herein, Defendants' actions substantially affected interstate trade and commerce throughout the U.S. and caused antitrust injury to Plaintiff and members of the proposed Class.

133.    While the conspiracy continues, Plaintiff and proposed Class members will continue to suffer losses.

134.    Defendants' price fixing conspiracy is per se unlawful.

## VIII.   CLASS ACTION ALLEGATIONS

135.    Plaintiff brings this action on behalf of itself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States and its territories that rented construction equipment from Defendants, or from a division, subsidiary, predecessor, agent, or affiliate of such rental company, at any time during the period of March 31, 2021 until Defendants' unlawful conduct and its anticompetitive effects cease to persist.

136.    The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

137.    Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

138.    **Numerosity.**  The Class is so numerous that joinder of all members in this action is impracticable. Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contain tens of thousands of similarly situated proposed Class members.  The Class is readily identifiable and for which records should exist.

139.    **Typicality.**  Plaintiff's claims are typical of those of the Class.  Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

140.    Plaintiff and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more to rent Construction Equipment than they otherwise would have in a competitive market.

141.    **Adequacy.**  Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class.  Plaintiff is willing and able to

assume the duties of a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

142.    **Common Questions of Law and Fact Predominate.**  Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be specific to individual class members, because the Defendants have acted and refused to act on grounds generally applicable to the Class.

143.    Questions of law and fact common to the Class include:

a.    Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to fix, inflate, maintain or stabilize the price and/or artificially suppress supply of Construction Equipment rentals from competitive levels;

b.    Whether such agreement constituted violations of the Sherman Antitrust Act;

c.    If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated the price and/or artificially suppressed supply of Construction Equipment from competitive levels;

d.    The proper measure of damages; and

e.    The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

144.    Plaintiff is represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

145.  **Superiority.**  Class action treatment is the superior method for the fair and efficient adjudication of the controversy because, among other reasons, it will permit a large number of similarly situated people or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

146.  **Injunctive Relief.**  Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    CAUSES OF ACTION

### COUNT ONE

### Agreement in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. §1

147.  Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

148.  Plaintiff seeks monetary and injunctive relief on behalf of themselves and all other members of the proposed Class under Sections 4 and 16 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

149.  Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in renting Construction Equipment to Plaintiff and the Class.

150.  Beginning in or around 2011, Defendants and their co-conspirators entered into and engaged in an unlawful contract, combination, or agreement, in restraint of interstate trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

151.    Specifically, Defendants have entered into a price fixing conspiracy to artificially inflate the price and/or decrease the supply of construction equipment rentals from competitive levels.

152.    Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

153.    Defendants have committed various acts in furtherance of this conspiracy, including, but not limited, to the following:

- Rouse created its RRI Price tool at the behest of Defendants United Rentals, Herc, and H&E;

- Rouse advertised and sold its pricing tool to additional rental companies as a means to raise prices and achieve greater profits;

- The Rental Company Defendants agreed to provide real-time, non-public, confidential, competitively sensitive, detailed internal data to Rouse for use in Rouse's collective pricing;

- The Rental Company Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, detailed internal pricing and utilization data;

- The Rental Company Defendants charged customers for rental equipment at the rate set by Rouse's pricing tool; and

- Rouse empowered the Rental Company Defendants to enforce the collective Rouse prices.

38

154.    The price fixing conspiracy has caused Plaintiff and the Class to suffer overcharge damages.

155.    There are no procompetitive justifications for the Defendants' actions, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

156.    The Defendants' price fixing agreement is unlawful under a per se mode of analysis. In the alternative, the Defendants' price fixing agreement is unlawful under either a quick look or rule of reason mode of analysis.

157.    As a direct and proximate result of Defendants' unlawful scheme, Plaintiff and members of the proposed Class have suffered injury to their business or property and will continue to suffer economic injury and be deprived of the benefit of free and fair competition unless Defendants' conduct is enjoined.

158.    Plaintiff and the proposed Class are entitled to recover three times the damages sustained by them and interest on those damages, together with reasonable attorneys' fees and costs under Section 4 of the Clayton Act, 15 U.S.C. § 15.

159.    Plaintiff and the proposed Class are entitled to a permanent injunction that terminates the unlawful conduct alleged herein, as well as any other equitable relief the Court deems proper.

## COUNT 2

### Conspiracy to Exchange Competitive Information in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)

160.    Plaintiff repeats and realleges all previous allegations as if fully set forth herein.

161.    Plaintiff pleads this legal theory separately and alternatively to the per se legal theory pled in Count 1, pursuant to Federal Rule of Civil Procedure 8 (d)(2) and (3).

162.    Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engaged in interstate commerce in renting Construction Equipment to Plaintiff and the Class.

163.    Beginning in or around 2011, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, non-public information regarding Construction Equipment rentals. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

164.    Defendants' acts in furtherance of their conspiracy included, but are not limited to the following:

- Rouse created its RRI Price tool at the request of Defendants United Rentals, Herc Rentals, and H&E Equipment;

- Rouse advertised and sold its pricing tool to additional rental companies as a means to raise rental prices and achieve greater profits;

- the Rental Equipment Defendants knowingly used the Rouse price tool, which incorporates other Defendants' real-time, private, confidential, competitively sensitive, and detailed internal pricing and utilization data;

- the Rental Equipment Defendants charged customers for rental equipment at the rate set by Rouse's pricing tool; and,

- Rouse empowered the Rental Equipment Defendants to enforce the collective Rouse prices.

165.    Defendants' conduct in furtherance of their unlawful scheme was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

166.    The relevant market is the product market for Construction Equipment rental, and the relevant geographic market is the United States.

167.    Defendants' regular information exchanges though Defendant Rouse and its systems reflected an independent concerted action between and among horizontal competitors in the relevant market. Each Defendant furnished competitively sensitive information with the understanding it would be reciprocated.

168.    Rouse enforced this understanding by requiring the Rental Equipment Defendants to share price, supply, inventory, and production information to receive comparable data from horizontal competitors. The agreement to regularly exchange this competitively sensitive information through Rouse's systems suppressed competition between the Rental Equipment Defendants and could not have been done without the assistance of Rouse.

169.    The competitively sensitive information obtained through Rouse and its systems was a material factor in the decision to inflate prices for Construction Equipment rentals during the Class Period.

170.    Defendants undertook this information exchange in furtherance of a price-fixing agreement, which is unlawful per se. Alternatively to Count 1's price-fixing claim, Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the exchange is anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means.

171.    Defendants' information exchange has had the effects of: (1) reducing and suppressing competition among Defendants in the market for Construction Equipment rentals; and (2) inflating the price of Construction Equipment rentals during the Class Period.

172.    As a result of this conduct, Plaintiff and Class members have been injured in their business or property by paying artificially inflated prices for Construction Equipment rentals during the Class Period.

173.    For this conduct, Plaintiff and members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 26 of the Clayton Act (15 U.S. Code §§ 15 and 26).

## XII.    PETITION FOR RELIEF

174.    Plaintiff petitions for the following relief:

A.    A determination that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as class counsel;

B.    A determination that the conduct set forth herein is unlawful under Section 1 of the Sherman Act under either a per se, quick look, or rule of reason mode of analysis;

C.    A judgment enjoining Defendants from engaging in further unlawful conduct;

D.    An award of attorneys' fees and costs;

E.    An award of pre- and post-judgment interest on all amounts awarded; and

F.    Such other relief as the Court deems just and equitable.

## XIII.   JURY DEMAND

175.    Plaintiff requests a trial by jury of all issues so triable.

Dated: May 29, 2025                              Plaintiff, McGinnis Construction Co, Inc.

                                          By_____/s/ct06163_____
                                              Steven L. Seligman, Its Local Attorney
                                              Katz & Seligman
                                              130 Washington Street
                                              Hartford, CT 06106
                                              Federal Bar #ct06163
                                              860/547-1857 (PH)
                                              860/241-9127 (FAX)
                                              SSeligman@KatzandSeligman.com

Please enter the below appearances in the plaintiff's behalf, in addition to the above:

Christian A. Sterling (#27528); CSterling@KatzandSeligman.com

                                           _/s/ Garrett D. Blanchfield_____
                                          Garrett D. Blanchfield (*pro hac vice forthcoming*)
                                          Brant D. Penney (*pro hac vice forthcoming*)
                                          Roberta A. Yard (*pro hac vice forthcoming*)
                                          REINHARDT WENDORF & BLANCHFIELD
                                          80 South 8th Street, Suite 900
                                          Minneapolis, MN  55402
                                          Tel:  (651) 287-2100
                                          g.blanchfield@rwblawfirm.com
                                          b.penney@rwblawfirm.com
                                          r.yard@rwblawfirm.com